## BEADLE *v.* BEADLE.

*(Circuit Court, D. Nebraska. May, 1881.)*[1]

1. WILLS—CONSTRUCTION.
    A will provided that the executors should sell testator's real estate and pay certain legacies, and devised the rest of his estate, real and personal, to his brothers. *Held* that, the legacies being paid in full, the title to the remaining real estate was vested in the devisees, and not in the executors.

2. FRAUDULENT CONVEYANCES—RELIEF.
    Where an assignment of an interest in an estate is made by one devisee to another for the purpose of defrauding creditors, it is void, and neither party to it can obtain any advantage therefrom.

3. TRUSTS—ACCOUNTING.
    Where one of two brothers owning an interest in land conveys the same to the other by quitclaim deed, for the purpose of convenience in making title, etc., it creates a trust in the grantee in favor of the grantor, and entitles the latter to an accounting.

In Equity.

Bill by David Beadle against Mishael Beadle to set aside a quitclaim deed given by complainant to defendant, and to establish a half interest in the land conveyed by it, and for an accounting.

*Webster & Gaylord,* for complainant.

*Esterbrook & Hall,* for respondent.

McCRARY, J. 1. We are to consider in the first place the question whether the complainant, David E. Beadle, derived title to the undi-

---

[1] Publication delayed by failure to receive copy.

vided half of the real estate in question under the will of John L. Beadle. The particular provisions of that instrument to be construed are the third and fourth clauses. The third clause provides "that after the payment of all debts, as above provided for, all the rest and residue of my property resting in real estate, [describing it,] together with all other, the land and real estate or interest therein, that I may have or hold in said county of Sarpy, in the territory of Nebraska, or elsewhere in that or any other territory, state, or county on the face of the earth; that my said real estate and chattels real be sold by my said executors for the best prices that can be procured therefor, either at public or private sale, (or by the survivor of my executors,) in their discretion, at any time within the space of ten (10) years after my decease, at such times as they shall deem best, and out of the avails of such sales, and the proceeds thereof, or any part thereof, I give, devise, and bequeath," etc., (naming various bequests to relatives, amounting in the aggregate to $950.) And the fourth clause is as follows:

"And the rest and residue of my property and estate, real and personal, of whatsoever nature or kind, not hereinbefore disposed of and already devised and bequeathed, (except the right and interest in a certain patent and invention hereinafter named,) I give, devise, and bequeath to my brothers, Mishael Beadle and David E. Beadle, to be divided equally between them, share and share alike; to have and to hold unto them, the said Mishael Beadle and David E. Beadle, and to their heirs and assigns, forever."

Respondent insists that this will vested the title in the executors, and made it their duty to sell the land and convert the proceeds into personalty, and that therefore the will itself was a conversion, so that the land must be treated as personalty. This upon the ground that, where a testator distinctly directs in his will that land shall be sold and converted into money, equity considers it as done. 2 Story, Eq. Jur. §§ 791, 793, 1212, 1214; *Craig* v. *Leslie*, 3 Wheat. 563. On the other hand, it is insisted by the complainant that these clauses of the will did not vest title in the executors; that they only authorized them to sell for the purpose of paying the several legacies named; and that by the terms of the will no equitable conversion was provided for or intended.

We must, if possible, construe the two provisions of the will above quoted so that both may stand; and there is therefore much force in the suggestion that it could not have been the intention of the testator by the third clause to require the sale by his executors of all his real estate, since by the fourth he bequeaths "the rest and residue" of his property and estate, both real and personal, to his brothers, Mishael Beadle and David E. Beadle, the complainant and respondent herein. The fourth clause bears upon its face strong proof that the testator did not anticipate that all his realty would necessarily be sold by the executors under the previous clause. The fourth clause not only expressly devises the residue of the realty,—thus assuming that there might be a residue of realty,—but it bequeaths the same, "to have and to hold, unto them, the said Mishael Beadle and David E. Beadle, and to their heirs and assigns, forever," which is the phraseology usually employed in convey-

ances of real estate. In the light of these considerations, let us look at the language of the third clause in the will. Does it convey the title to the executors, or simply vest in them a naked power of sale? If the latter, then the title, which could not rest in abeyance, must have passed to the devisees subject to the right of the executors to sell. Upon this subject Judge Redfield, in his work on Wills, (volume 3, p. 136,) says:

"It is often made a question whether the executor takes a fee-simple under the will, upon which his power to dispose of the same is ingrafted, or a mere naked power to dispose of the title to the estate in a particular mode, in order to effect the purposes of the will."

And in a note, on page 137, the same author lays down the rule for determining the question in these words:

"It is said the devise of the land to the executors to sell passes the title; but a devise that executors may sell, or shall sell, lands, or that they may or shall be sold by the executor, gives them only a naked power of sale." Citing Sugd. Powers, (8th Ed.) 112; *Doe* v. *Shotter*, 8 Adol. & E. 905.

Judged by this rule, it is clear that the will now under consideration did not vest the title in the executors. There are no words of conveyance or devise to them. The language is "that my said real estate and chattels real be sold by my executors," etc. He does not say: "I give and bequeath to my executors," etc.; nor does he use any equivalent language. There are certainly no words expressly passing the title to executors, and since the purpose of the testator is secured as well by treating the instrument as conferring only a power of sale, and since by this construction all the provisions of the will may be harmonized, I adopt it.

Another consideration has great weight with me in determining the true construction of this will. It is conceded that all the legacies provided for in the will, to be paid out of the proceeds of the sale of the land, have been paid in full. The legatees are therefore satisfied, and there is no one to claim the property as personalty. The complainant and respondent both claim realty under the will. They have both elected to claim the realty, as their pleadings in this case abundantly show. The complainant sues as devisee, and claims title under the will. The respondent claims title in himself by virtue of the will and a conveyance from complainant. He sets out the will as a part of his answer, and as the source of his title, and prays that his title may be quieted. The legacies having been paid, it is clear that the whole beneficial interest under the will, whether that interest be in the land or in the proceeds of a sale thereof, is in the same parties; that is to say, in complainant and respondent jointly, or respondent solely,—in both, if complainant succeeds in this controversy; in the respondent, if he is successful. Now, the law is well settled that where the same person is to receive the bequest, whether it remain in the form of realty or be sold and converted into money, that person may elect to take either. This for the reason that no other person can by possibility have any interest in the question. It is only in cases where if the property be treated as realty it will go to one party, and if regarded as personalty to another, the questions arise

requiring the intervention of courts, and the application of the principles contended for by the respondent. Courts of equity cannot be called upon to hear and determine controversies concerning purely abstract questions, and which do not involve substantial rights. If the same result follows a decision either way, there is nothing with which a court ought to be troubled. A court of equity will not compel a trustee to execute a trust against the wishes of the *cestui que trust*. If the latter is entitled to the land, or its proceeds if it be sold, the court will allow him to take his choice. This rule is settled by the case of *Craig* v. *Leslie, supra*, and by a uniform current of authority in this country and in England. My conclusion upon this branch of the case is that by the will the title was vested in the devisees, and not in the executors; and I proceed to consider the other questions presented in the case.

2. We are next to consider the force and effect of the following instrument executed by complainant to respondent:

"To all whom it may concern: Know that I, D. E. Beadle, of the town of Galen, Wayne county, New York state, for and in consideration of certain notes signed by Mishael Beadle as security for me, do hereby, and by these presents, assign and convey to the said Mishael Beadle all my right, title, and interest in and to certain lands in the territory of Nebraska, acquired by me through the will of John L. Beadle, deceased. Dated this first day of April, 1865.      [Signed]                                    DAVID E. BEADLE."

The bill in this case is not filed for the purpose of setting aside the assignment; it is aimed at the quitclaim deed subsequently executed. It is, however, insisted on behalf of respondent that this assignment and the said quitclaim deed are parts of the same transaction; that both were executed for the same consideration, and for the same purpose, viz., to vest in respondent the title to the land absolutely and unconditionally. It is further insisted that if it be found that the purpose of this assignment was to defraud the creditors of complainant, then he cannot be heard to attack it, and that the same must be held with respect to the quitclaim deed afterwards made in consummation of said assignment. Whatever may have been the purpose of this instrument, it is very clear that it was not intended by the parties as a conveyance of all the interest of complainant in the real estate, and that it was not, after its execution, treated by them as having any such purpose or effect. After its execution the respondent continued in various ways to recognize the interest of complainant in the land, and to consult him from time to time with respect to sales thereof, and its management generally. In numerous letters addressed to complainant he speaks of the land as "ours," as "our property," and "our land," etc.; and in several written long after the assignment he speaks of the respondent's "interest" in the land, and of his "part" thereof, and in one he speaks of an expected settlement and division between them. Without quoting in this connection from these letters, it is sufficient to say that they cannot be harmonized with the theory that the assignment was intended or understood as divesting complainant of all interest in the land. To construe that instrument as having been given as a security in the nature of a mortgage, to indemnify

respondent against loss on account of his indorsement of the notes of complainant, would do no great violence to its terms; but the master has found, and I think correctly, under the evidence, that the assignment was executed by complainant for the purpose of covering up his Nebraska interests as against the claims of his creditors. This makes it necessary for us to consider the question whether complainant is estopped to recover in this case upon the ground that he is asking relief as against his own fraudulent act. The well-settled rule is that no affirmative relief will ever be granted upon a fraudulent contract to either of the parties thereto. If it be true that complainant is asking this court to set aside this assignment, or that the assignment is so clearly identified with the quitclaim deed that they must be regarded as parts of the same transaction, then, in either case, I would have no hesitation in saying that he is not entitled to relief. The same result, however, would follow as to respondent. He was a party to both instruments, and was *in pari delicto.* If they were fraudulent, he, too, was a party to the fraud, and can claim nothing under either of them. The court would in that case refuse relief to either party, and leave them in precisely the position in which they have placed themselves. *Telegraph Co.* v. *Railway Co.*, 1 McCrary, 418, 3 Fed. Rep. 1, and cases cited.

If, therefore, the assignment and the deed are to be regarded as parts of the same fraudulent scheme to defraud the creditors of complainant, it would inevitably follow that both would be treated as absolutely null and void, and the parties would be left, as between themselves, without any right to a decree to enforce or set aside either the one or the other. This result would be much more injurious to the interests of respondent than to those of the complainant, since the latter is in possession; and, if the two instruments are ignored, he can, as against respondent, hold the undivided half of the land—all that he claims—under the provision of the will of John L. Beadle. But I am of the opinion that the evidence does not sustain the position of respondent, that the assignment and the quitclaim deed are parts of one and the same transaction, both executed for the same consideration and for the same purpose. Upon this question, as upon nearly all the disputed questions of fact in this case, the testimony of the complainant and respondent is in direct conflict. They are equally interested, and, so far as appears, equally intelligent and credible. I conclude, therefore, that the matters of fact in controversy between them, and concerning which their testimony is in conflict, must be determined by a consideration of the corroborating testimony, and particularly by the acts, declarations, and writings of the parties contemporaneous with the transactions in question. What was said and done by the parties in connection with these transactions at the time they were transpiring, and before any ill will had arisen, may be relied upon as exhibiting a reliable indication as to their aims and purposes.

For what purpose was the quitclaim deed executed? Complainant swears that it was for the purpose of simplifying the title, and making it more satisfactory to purchasers of lots, who objected to the title made

by the executors without an order of court. Respondent swears that there was no such purpose, but that, on the contrary, the object was to invest him with the fee-simple title, absolutely and unconditionally. This dispute can best be settled by reference to the correspondence between the parties which preceded and led to the execution of the deed, and this settles it very satisfactorily in favor of complainant. I do not find in this correspondence a single allusion to the assignment which has been executed four or five years before, and apparently ever since entirely ignored. I do find, however, the reason for the execution of the quitclaim deed clearly and repeatedly stated in this correspondence by the respondent himself. In a letter dated December 12, 1869, respondent expresses his surprise that the title was questioned, or that there was anything more to be done, and goes on to propose a plan for arranging the matter and satisfying purchasers. He proposes to pay the legatees, get their receipts in full, and then adds:

"I see no other way, but you must quitclaim to me your interest in the will. I have already assumed all the debts, and that settles up the estate, and leaves the title in me individually. Then, as soon as we can sell enough to pay these debts, we can settle, and I will deed you your part. All the trouble there is, is in your trusting me until we can do so. We can then do without the other executor."

It is impossible to believe that the respondent would have used this language if the parties had understood that complainant was to execute the deed in consummation of the assignment, and to have no interest thereafter. This letter demonstrates that the quitclaim was asked for upon quite another ground, to-wit, that the estate should be closed, the legacies and debts paid, the title vested in one person, who could make deeds, and afterwards a settlement and division could be made as betwe n the two brothers to whom the land has been devised. In a later letter on the same subject respondent writes to complainant: "You can quitclaim your interest in the will. Trust me, it shall be all right." In still another letter (not dated) respondent writes to complainant: "I will pay the expense, if you quitclaim your interest in the will. It will be easier for me to settle with the surrogate, for then he will not have to look after your interest. That will be between you and me to do." Other letters contain similar language. In no one of them is it intimated that respondent is entitled to the quitclaim as a matter of right, or as the real owner of the property, or because of the assignment of 1865. If the negotiations had been conducted upon the basis of his entire and unconditional ownership, as now claimed by respondent, the correspondence would have given some expression or suggestion of such an understanding or of such a claim. We find nothing of the kind; but, on the contrary, repeated and explicit declarations showing that such was not the intention of the parties. I conclude, therefore, that the quitclaim deed was not executed for the purpose of making effective the previous assignment; that it was the result entirely of negotiations arising subsequently to the assignment, and having no connection therewith; and that, therefore, the parties are not estopped by the fraudulent character of the as-

signment to contest in this case the validity or the force and effect of the quitclaim.

This brings us to the question whether the said quitclaim deed was in equity an absolute and unconditional conveyance of all the interest of complainant in the land, or a conveyance, as between the parties in trust, made for convenience, and leaving the respondent bound to account for proceeds of sales, and to reconvey upon final settlement any interest of complainant's remaining in the land. This question has been to some extent anticipated in what has been said. We have seen that the deed was executed for the purpose of facilitating the conveyance of portions of the property to purchasers by vesting the legal title fully in respondent. The quotations already made from the contemporaneous correspondence between the parties show this. This conclusion is confirmed by the acts and declarations of respondent subsequently to the execution of the quitclaim deed. He did not assume to be the owner of the property. He did not claim possession, nor deny the right of the complainant. On the contrary, he went on assuming that the two were still jointly interested. Perhaps the most conclusive proof upon this point will be found in the letter of the respondent which is in evidence, marked "Exhibit R," in which he says:

"This satisfaction piece and your quitclaim being recorded, there will be no question in my giving a warranty deed; and, just as soon as we can sell and pay some of the debts resting on me, we can settle and divide, or hold it together, just as we are a mind to. I see nothing to hinder, if you are satisfied to do so."

It is clear that the execution of the quitclaim deed, under the circumstances developed in the proof, did not divest complainant of his interest in the lands devised under the will, but said interest was vested in respondent only in trust, and he was bound in equity to account to complainant therefor.

3. It remains only to consider the effect of the contract, a copy of which is attached to the answer, dated June 20, 1877. By this instrument the respondent agreed to furnish "good and sufficient warranty deeds" for the land in question, when called upon by complainant to do so, as he should sell or dispose of lands. Complainant was to pay respondent $11,000 for his interest, the whole amount to be paid within five years; and to pay at least $600 per annum, together with all money or securities received for the sale of said real estate. Whenever $2,000 was paid, the complainant was to have a deed for the house and block upon which he resided. By reference to the pleadings, it will be seen that neither party is seeking in this suit to enforce this contract. It seems to be assumed that it has been abandoned and rescinded by the parties to it. It seems pretty clear that it was repudiated by the respondent as early as the 15th of March, 1878; for on that day he wrote to complainant that he was resolved to sell the land and the buildings, and would want possession when he made a deed. The time for carrying out the contract had not expired, and this notice could have been given only upon the theory of an abandonment of the contract. It is, however,

enough for the present to say that the court is not asked to specifically enforce it. It is offered in evidence only as tending to establish the claim of the respondent to the entire ownership of the real estate. It contains a reference to the land as "now owned by" Mishael Beadle; but this recital is not, in my judgment, sufficient to overcome the proof already referred to, establishing the fact that he did not, in fact, own the whole of said land.

Upon the whole case, my conclusion is that all the exceptions to the master's report, by both parties, should be overruled, and that the said report should be confirmed and decree rendered as recommended. It is accordingly so ordered. The case will be recommitted to the master to state an account in accordance with his findings, and with power to take further testimony touching the matter of the account between the parties.